UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOYCELYN ROBERTS              )
                              )
Plaintiff,                    )
                              )     CIVIL ACTION
v.                            )     NO. 07-cv-12154-DPW
                              )
DELTA AIR LINES, INC.         )
                              )
Defendant.                    )

MEMORANDUM AND ORDER
December 4, 2008

Plaintiff Joycelyn Roberts, a former flight attendant,
brings this action for negligence against defendant Delta Air
Lines, Inc.  Roberts alleges that, while she was working as a
flight attendant, she suffered severe injuries when an airplane
operated by Delta pilots came to an abrupt halt on the runway
before takeoff.  Delta has moved for summary judgment on grounds
that Roberts's claim is barred by the Massachusetts Workers'
Compensation Act.  Delta claims Roberts was a Delta employee at
the time of her injuries, and that a workers' compensation
settlement she accepted with Delta in connection with those
injuries is her sole and exclusive remedy.  Roberts contends she
was not a Delta employee at the time of the runway incident, but
was instead an employee of Song, LLC, a wholly-owned Delta
subsidiary.  Roberts argues that her workers' compensation
settlement does not therefore preclude a third party negligence
action against Delta.  I find that although Roberts was a Song
employee when she was injured, she was a "loaned servant" from

Song to Delta.  Consequently I will grant Delta's motion for summary judgment.

## I. FACTUAL BACKGROUND

*A.    The Parties*

Delta Airlines, Inc. is a Delaware corporation with a principal place of business in Atlanta, GA.  Joycelyn Roberts is a Mississippi citizen, who began working as a Delta flight attendant in 1997.  In 2003, Roberts applied for a flight attendant position with Song Airways, LLC, a wholly-owned subsidiary of Delta.[1]

*B.    Delta's Low Cost Carrier Initiative*

Because the plaintiff's employment status in connection with Delta and Song is central to the issues presented by this motion, I will set forth in some detail the circumstances surrounding the creation and development of the subsidiary company.

In the wake of the events of September 11, 2001, airline customers began traveling less frequently, and well-established airlines like Delta faced increasingly intense competition from rival low cost airlines.  In order to compete effectively in this changing market, Delta conceived the idea of establishing its own so-called "low cost carrier."  Delta aimed to market this carrier

---

[1] Delta's subsidiary underwent several changes to its name and corporate structure over the course of its existence.  In 2003, when Roberts applied for a flight attendant position, the company was named "Song Airways, LLC."  At the time of the runway incident, it was named simply "Song, LLC."

to cost-conscious vacation travelers.  In October 2002, as part of this initiative, Delta created and registered a Delaware limited liability company named "Savannah II, LLC."  Several months later, Delta amended the company's name to "Song Airways, LLC."

In early 2003, Delta communicated with the Federal Aviation Administration concerning its plans to begin operating the new low cost carrier and to use the "Song" brand name.[2]  These efforts were complicated by the fact that Song Airways, LLC - unlike its parent, Delta Air Lines, Inc. - did not have its own Operating Certificate with the FAA.  Under FAA regulations, an entity must have an Operating Certificate in order to conduct commercial flight operations in the United States, or to advertise or otherwise offer such services to the public.  14 C.F.R. §§ 119.5(b), (k).  Moreover, the holder of an Operating Certificate cannot conduct business under a name that does not appear on the certificate holder's Operations Specifications.  14 C.F.R. § 119.9(a).  Delta therefore sought to amend the Operations Specifications of its own Operating Certificate to allow it to conduct Delta flight operations under the name

---

[2] Roberts objects to Delta's references to "Song" as merely a "brand," on grounds that Song Airways, LLC, was formed as its own company.  I use the term "brand" to describe Delta's efforts to market flights to the public under the name "Song."  I recognize, however, that Song Airways, LLC, also existed as a separate legal entity.

"Song."

     In a letter dated March 31, 2003, the FAA approved Delta's

request to use the name "Song" in connection with its low cost

flights, contingent on Delta's adherence to two conditions

mandated by FAA regulations.  First, Delta Air Lines, Inc., as

the holder of the Operating Certificate, was required to remain

in operational control of all flights doing business under the

name "Song."[3]  Second, Delta was prohibited from making any

marketing references that might lead a reasonable person to

conclude that "Song" flights were actually operated by another

entity – in particular, by Delta's subsidiary Song Airways, LLC.

To this end, Delta was permitted to use the name "Song" only as a

"brand/trade name," and could not "reference or connect Song

Airways LLC" with its low cost flight operations.  Delta was not

---

     [3] In the letter, the FAA referred to such flights as "Delta
d/b/a Song flights."  The designation "d/b/a" typically describes
an entity's efforts to conduct business under another name (an
alias), rather than describing a separate legal entity.  *See
Rogers v. Kolman*, No. 002871, 2001 WL 1525531, *4 (Mass. Super.
Aug. 21, 2001) ("The designation does not create an entity
distinct from the person operating the business.") (internal
quotation and citation omitted).  The FAA used this term in the
letter to describe flight operations conducted by Delta Air
Lines, Inc. under the trade name "Song."  The FAA distinguished
*this* use of the name "Song" (as an alias for Delta) from the name
of Delta's subsidiary "Song Airways, LLC," a legal entity
separate from its parent corporation.  Although Delta later
changed the name of its subsidiary to "Delta d/b/a Song, LLC," –
and ultimately to simply "Song, LLC," – there remained at all
times a distinction between the use of the name "Song" as a
"d/b/a" alias for Delta's own flight operations and as the name
of Delta's subsidiary company.

permitted to advertise Song as a "new airline," "new airline service," "new air carrier," or "new carrier." The FAA did not, however, object to the existence of Song Airways, LLC as a separate legal entity that would "be providing certain services and/or personnel for the Delta d/b/a Song operations."

On April 1, 2003, one day after receiving the FAA letter, Delta amended the name of its Delaware subsidiary from "Song Airways, LLC" to "Delta d/b/a Song, LLC."[4] Over the next few years, the company underwent several other changes to its name and corporate status. In May 2004, Delta created and registered a New York limited liability company named "Song Merger Sub, LLC." Shortly thereafter, Delta merged its Delaware subsidiary – "Delta d/b/a Song, LLC" – into this new subsidiary, with the New York company as the sole surviving entity. In June 2004, Delta amended the name of the New York subsidiary to "Song, LLC." The subsidiary operated in this form until April 2007, when Delta ended its low cost carrier initiative, retiring the "Song" brand name and merging Song, LLC, into its parent corporation, Delta Air Lines, Inc.

---

[4] There is nothing to suggest this name change was mandated or even requested by the FAA. In fact, to the contrary, the March 31, 2003, FAA letter indicated that the entity named "*Song Airways, LLC*" would be permitted to provide services and personnel for Delta flights operating under the trade name "Song," so long as Delta adhered to the operational and marketing restrictions described in the letter. In any event, the use of the term "d/b/a" in the name of the subsidiary company did not alter its status as a separate legal entity from Delta.

C.  *Song Flight Operations*

In accordance with the FAA's requirements, Delta maintained operational control over all flights using the "Song" trade name. The Song flights were conducted pursuant to Delta's Operating Certificate.  The flights departed from gates leased by Delta and staffed by Delta personnel, were commanded by Delta pilots, and were flown on airplanes owned by or leased to Delta.  The aircraft were maintained by Delta mechanics and serviced by Delta's ramp personnel.  In communications with the control tower or with other airplanes, the pilots identified Song flights by Delta flight numbers.

Song, LLC, however, maintained its status as a separate company.  Song had its own its own president, vice presidents of various departments, a human resources manager, and a communications manager.[5]  Furthermore, although Delta included Song profits and losses in its own financial reports, Song had a separate payroll that issued paychecks directly from the subsidiary company to certain employees, including flight attendants and customer service agents.[6]  Flight attendants

---

[5] All of these officers also remained employees of Delta and reported to Delta's president.

[6] According to Roberts's deposition testimony, the President of Song, John Selvaggio, once described a payment system at a meeting with Song flight attendants whereby Song, LLC was charged by Delta for fuel, baggage handling, and aircraft maintenance provided by Delta and its personnel.  Joanne Smith, Delta's former vice-president of marketing and in-flight customer

seeking positions with Song were required to apply and interview,
even if they were already employed by Delta.  Those selected as
Song flight attendants underwent additional customer service
training focused on the new Song services and amenities.  They
also wore specially designed Song uniforms, and were issued new
Song employee badges and ID numbers.  Song flight attendants were
assigned regularly to work only on Song flights.  In the case of
an illness, injury, or other cancellation, however, Delta and
Song flight attendants could be assigned interchangeably as
needed to satisfy the FAA's minimum requirements for flight
attendants aboard each flight.

　　　Song flight attendants maintained a variety of connections
with Delta.  Recurrent training for all flight attendants, which
was required by the FAA, was conducted by Delta personnel at the
Delta training center in Atlanta.  Song flight attendants relied
on an in-flight manual that was created and disseminated by
Delta.  Delta personnel developed the employment policies for all
Song personnel, and at times supervised and evaluated the

---

service, denied that there was ever any such system.  Roberts's
testimony is not, as Delta contends, hearsay, because Selvaggio
was also an employee of Delta, and his statements were therefore
admissions under Fed. R. Evid. 801(d)(2)(D).  This factual
dispute, however, has been rendered moot by my evidentiary ruling
striking this snippet from Roberts's deposition testimony from
the record.  *See* Note 16, *infra*.  Moreover, as will appear below,
the issue is not material to my disposition of the summary
judgment motion.

performance of Song flight attendants.[7]  Delta personnel also
determined flight assignments for particular Song flight
attendants.  Furthermore, the seniority of Song flight attendants
was based on their original hiring date with Delta, and Song
flight attendants were permitted to "deadhead" on any Delta
flights.[8]

Delta's role in the operation of Song was also apparent in
Song's marketing and consumer relations.  Although early
marketing materials for Song flights made no reference to Delta,
later marketing efforts were adjusted to comply with the FAA's
requirement of clearly indicating Delta's operational control of
Song flights.[9]  Song's web site expressly noted that "Song is
operated by Delta Air Lines."  The airplanes flown under the Song
name were painted with Song colors and decorated with the Song
"flourish" logo, but the fuselage of each plane was also painted

---

[7] Roberts claims in her summary judgment opposition brief
that as a Song flight attendant "she no longer reported to Delta
personnel."  This contention is not, however, supported by any
evidence in the record. *See Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 256 (1986) ("[A] party opposing a properly supported
motion for summary judgment may not rest upon mere allegation or
denials of his pleading, but must set forth specific facts
showing that there is a genuine issue for trial.")

[8] An airline employee "deadheads" on a flight when she flies
as a passenger without having paid for a ticket. *See Webster's
Third New International Dictionary* 580 (1986) (second
definition).

[9] Delta, as the holder of the Operating Certificate, was the
only entity permitted to conduct advertising of commercial
flights under the "Song" trade name.  14 C.F.R. § 119.5(k).

with the words "Operated by Delta Air Lines, Inc.," and the Delta "widget" logo.  Song flight attendants were cautioned against referring to Song as a "new airline" or describing the flights as "Song Airways."  Public address announcements, for example, would refer to Song as "Delta's low fare service."

   *D.   Plaintiff's Employment*

   Roberts applied for a flight attendant position with Delta in 1997.  In her job application, Roberts acknowledged that Delta was "operating under workers' compensation law, and that in case of injury, [she would] accept compensation as provided by said law, where applicable, and [t]hereby waive[d] any and all other claims for damages or other relief on account of any injury, including all actions at law."  The job application also required Roberts to agree that she could not "be employed by another airline and Delta Air Lines simultaneously."[10]  Roberts worked as a Delta flight attendant from 1997 until 2003.

   On February 25, 2003, Roberts applied for a position as a Song flight attendant.  Delta had posted information about applying for Song positions on its flight attendant web site, and had also sent an email to its employees about the opportunity to

---

[10] This acknowledgment does not appear on the copy of the job application submitted with Delta's summary judgment brief.  The assertion about the contents of the application, however, appears in Delta's Concise Statement of Facts and is undisputed by Roberts, indicating that perhaps the copy of the application filed with the court was incomplete.

work for Song.  The Song flight attendant application purported to define the applicant's "employment relationship with Song Airways, LLC," and referred to the role of "Song supervisory or management personnel."  The application also indicated that Song, like Delta, "operat[ed] under workers' compensation law" and that Roberts "waive[d] any and all other claims for damages or other relief on account of any injury, including all actions at law."

Roberts was interviewed for the Song flight attendant position by Sandra Ingram, a Delta in-flight supervisor.  After accepting the ensuing offer, Roberts selected Boston as her Song flight attendant base.  According to Roberts, this acceptance effectively terminated her employment with Delta.  In particular, she noted that the position with Song came with an obligation to work as a Song flight attendant for at least three years, at which point she could decide whether to stay at Song, return to Delta, retire, or seek employment elsewhere.  As a new Song flight attendant, Roberts was issued a Song ID number and an employee badge.[11]  She also underwent Song customer service training.

E.  *Runway Incident*

Roberts's injuries occurred on March 6, 2005, while working as a flight attendant on a commercial Song flight from Boston to

---

[11] The reverse side of the badge, submitted by counsel for Roberts at the hearing in this matter, reads: "Property of Song (A Delta Air Lines Company)."

Las Vegas.  She was part of a team of four Song flight attendants.  The pilot and the first officer were both Delta pilots.

When the plane was taxiing away from the terminal and toward the runway, the first officer called to the pilot to "stop the aircraft," or words to that effect, and the pilot brought the plane to an abrupt stop.[12]  After one flight attendant notified the pilot that she had injured her elbow, the plane taxied back to the gate, where she was examined by paramedics and ultimately replaced by a Delta flight attendant.  Roberts, despite reporting some bruising from the incident, was initially able to continue on the flight to Las Vegas.  En route, however, she reported back pain to the pilot, who arranged for paramedics to meet the flight upon its arrival. In Las Vegas, Roberts and another flight attendant were taken to a hospital for further evaluation.  On the return flight to Boston, all three injured flight attendants, including Roberts, were replaced with Delta flight attendants.

*F.    Workers' Compensation Claim and Negligence Action*

Roberts alleges that as a result of the runway incident, she suffered severe back injuries and a herniated disc.  She was required to undergo multiple spinal surgeries and continues to receive ongoing medical treatment for significant back pain.

---

[12] Delta and Roberts dispute the circumstances surrounding the first officer's call to stop the aircraft.  This dispute is not relevant to the issues presented by this motion.

Roberts filed a workers' compensation claim for these injuries with Song, LLC.[13]  Delta Air Lines, Inc. and Song, LLC were both among the named insured parties on a single workers' compensation policy issued by ACE American Insurance Company.

In October, 2005, Roberts filed this civil action for negligence against Delta in the Massachusetts Superior Court.  In January, 2006, the case was stayed following Delta's petition for relief from the United State Bankruptcy Court.  Shortly after modification of this stay, Delta filed a Notice of Removal to this court.

On May 9, 2008, Roberts consented to a lump sum settlement agreement "for redeeming liability" of her workers' compensation claim.  The agreement lists Roberts's employer as "Song Airlines/Delta (In Dispute)."  The agreement was signed on behalf of Delta by Robert Tirella, a Delta workers' compensation specialist.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is permissible when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[13] Neither party has provided evidence regarding the circumstances of Roberts's workers' compensation claim.  Roberts, however, contends in her summary judgment opposition brief that she filed this claim "through her employment with Song," and not with Delta Air Lines, Inc.  Because Delta has made no contrary assertion, I will treat Roberts's contention as undisputed for purposes of this motion.

that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).[14]  A "genuine factual issue" is one that
"may reasonably be resolved in favor of either party."  *Anderson
v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986).

In making its summary judgment inquiry, the court "must view
the entire record in the light most hospitable to the party
opposing summary judgment, indulging all reasonable inferences in
that party's favor."  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115
(1st Cir. 1990) (Selya, J.).  The party opposing a properly
supported motion for summary judgment, however, "may not rest
upon mere allegation or denials of his pleading, but must set
forth specific facts showing that there is a genuine issue for
trial."  *Anderson*, 477 U.S. at 256.  The judicial function in
conducting this evaluation is not to weigh the evidence and
determine the truth of the matter, but rather to determine
whether the evidence presented is such that a jury "could
reasonably find for either the plaintiff or the defendant."  *Id.*
at 249, 255.

----

[14] Although Roberts cites Massachusetts case law for the
summary judgment standard in her opposition brief, federal courts
must employ the summary judgment standard from the Federal Rules
of Civil Procedure, irrespective of whether diversity
jurisdiction requires the application of state substantive law.
*See, e.g., Doe v. Doe*, 941 F.2d 280, 287 (5th Cir. 1991); *McEwen
v. Delta Air Lines, Inc.*, 919 F.2d 58, 60 (7th Cir. 1990).

### III. EVIDENTIARY DISPUTES

To be admissible for consideration on a summary judgment motion, documents must be authenticated by and attached to an affidavit that meets the requirements of Federal Rule of Civil Procedure 56(e). *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000). These affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Delta initially contends that all twenty-three of the exhibits Roberts filed with her summary judgment opposition brief should be invalidated based on the absence of any affidavit authenticating and identifying them. I dealt only with specific objections at the hearing in this matter on the assumption that if afforded the opportunity, counsel for Roberts could provide an appropriate covering affidavit.[15]

Turning to Delta's specific objections to several particular exhibits, I made the following rulings. First, as to Delta's objections on grounds of hearsay regarding Exhibits 4 and 23, articles from FastCompany.com and the Boston Globe, I sustained the objections. I found that these articles were inadmissible as

---

[15] For example, as to Exhibit 17, Roberts's pay stubs, Delta's counsel conceded there was no true objection as to lack of authenticity and identification. Accordingly I received that exhibit.

hearsay. *See, e.g., Ebel v. Eli Lilly and Co.*, 536 F. Supp. 2d 767, 776 (S.D. Tex. 2008) ("[A]rticles riddled with hearsay, whether from The New York Times or not, are inadmissible evidence that will not be considered.").

Second, as to Delta's objections to Exhibits 8, 15, and 16 under Fed. R. Evid. 106, I sustained as to Exhibits 8 and 16 and denied as to Exhibit 15. Rule 106 indicates that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106. Exhibit 8 is a photograph of a Song airplane that shows the Song "flourish" logo but lacks sufficient clarity to also show the Delta "widget" logo and the statement "operated by Delta Air Lines, Inc." Exhibit 15 is a photocopy of only the front of Roberts's Song ID badge and does not include the back, which reads: "Property of Song (A Delta Air Lines Company)." Exhibit 16 is the cover of the Song Training Manual, which does not include 51 other pages of the manual that include several references to Song's connection with Delta. Except for Exhibit 15, as to which Roberts's counsel provided a complete copy at the hearing, I sustained these objections on grounds that

the exhibits are neither clear enough nor sufficiently complete to be admissible.[16]

Third, as to Delta's objections on grounds of relevance to Exhibits 5, 9, and 19-20, *see* Fed. R. Evid. 402, I sustained the objections. Exhibit 5 is an organizational chart, showing the officers of Delta and Song, LLC. This document is not authenticated, and in the absence of authenticating context it is not sufficiently complete to assist in understanding the corporate structure of Song, LLC, especially given Delta's contention that the precise officer structure had changed by the time Roberts was injured. Exhibit 9 is a collection of fact sheets, press releases, and marketing materials, for which Roberts has not provided any evidence of circulation or distribution, and is similarly inadmissible because of a lack of authenticating context. Exhibits 19-20 are deposition transcripts of the Delta pilots who commanded the airplane on which Roberts was injured that pertain entirely to the circumstances of the first officer's call to stop the airplane and the pilot bringing the craft to an abrupt halt. The dispute over these events is not relevant to this motion.

---

[16] This also applies to Exhibits 1-3 and 6-7, which are excerpts from deposition transcripts. Delta's objection that Roberts "relied upon inaccurate readings and/or interpretations" of these excerpts is a matter for argument and not a true evidentiary objection, but the exhibits are nonetheless inadmissible for lack of sufficient completeness.

## IV. CHOICE OF LAW

Federal courts sitting in diversity jurisdiction apply the forum state's principles regarding choice of law. *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Massachusetts choice of law rules, "tort claims are governed by the law of the state where the injury occurred, unless another state has a more significant relationship to the cause of action." *Dunfey v. Roger Williams Univ.*, 824 F. Supp. 18, 21 (D. Mass. 1993) (citing, *inter alia*, *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333 (1983)); *see also* Restatement (Second) of Conflict of Laws § 146 (1971). In the present case, not only did Roberts's injuries occur in Massachusetts, but her Song flight attendant base was Boston. Roberts also filed for – and ultimately accepted a settlement in connection with – workers' compensation benefits under Massachusetts law. *See Spencer v. Kantrovitz*, 392 F. Supp. 2d 29, 35 (D. Mass. 2005) (finding the plaintiff's decision to accept workers' compensation benefits in Massachusetts determinative in a choice-of-law analysis). Given these circumstances, and in light of the fact that neither party has contended that any other state has a more significant relationship to this cause of action than does Massachusetts, I find that Massachusetts substantive law governs.

## V. TORT IMMUNITY UNDER WORKERS' COMPENSATION ACT

A.   *The Massachusetts Workers' Compensation Act as an Exclusive Remedy*

Where the Massachusetts Workers' Compensation Act (the "Act") is applicable, it affords the exclusive remedy for an injured employee against his or her employer.  *See* Mass. Gen. Laws ch. 152, §§ 23-24.  This exclusivity is part of the quid pro quo inherent in the workers' compensation system, where an employer assumes liability without proof of fault but is thereby relieved of the prospect of large damage verdicts from personal injury claims.  *See* Arthur Larson & Lex K. Larson, 6 Larson's Workers' Compensation Law § 100.01 (2008).  The Massachusetts Supreme Judicial Court has called the exclusivity provisions "the cornerstone of our Workers' Compensation Act."  *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 656 (1993) (Abrams, J.).

Under § 23 of the Act, an employee who files a workers' compensation claim or accepts payment of compensation for a personal injury consequently releases both the employer and the workers' compensation insurer "of all claims or demands at common law, if any, arising from the injury."  Mass Gen. Laws. ch. 152, § 23.  Even if an employee does not elect to pursue a workers' compensation claim, an employer will generally have tort immunity in connection with an injury that would otherwise be compensable under the Act.  This is because under § 24 of the Act, an

employee waives the right to pursue actions at common law for compensable injuries "if he shall not have given his employer, at the time of his contract or hire, written notice that he claimed such right." *Id.* at § 24.  It is undisputed in this case that Roberts did not give this notice to either Delta or Song.  In fact, Roberts expressly waived any such right in her flight attendant job applications with both entities.

Both §§ 23 and 24 bar common law tort claims where: 1) the plaintiff is an employee; 2) the plaintiff's condition is a personal injury within the meaning of the Act; and 3) the injury arose out of and in the course of employment.  *See Foley v. Polaroid Corp.*, 381 Mass. 545, 548-49 (1980) (Liacos, J.). Neither party in the present case disputes that Roberts's back injuries constitute "personal injuries" within the meaning of the Act, nor that Roberts was injured in the course and scope of her employment as a flight attendant.  There is, however, a dispute as to whether Roberts, at the time of her injuries, may be deemed an employee of Delta or was instead an employee only of Delta's subsidiary, Song, LLC.

The Act broadly defines an "employee," with exceptions not relevant here, as "every person in the service of another under any contract of hire, express or implied, oral or written . . . ."  Mass. Gen. Laws ch. 152, § 1(4).  The Act defines an "employer" as: "an individual, partnership, association,

corporation, or other legal entity . . . employing employees subject to this chapter . . . ." *Id.* at § 1(5). Massachusetts courts have held that an employee's status under the Act is determined primarily by reference to "'who has direction and control of the employee and to whom does he owe obedience in respect of' the performance of his work." *Patterson v. Liberty Mut. Ins. Co.*, 48 Mass. App. Ct. 586, 591 n.13 (2000) (quoting *Chisholm's Case*, 238 Mass. 412, 419 (1921)); *see also Silvia v. Woodhouse*, 356 Mass. 119, 124 (1969) ("In general the existence of a master-servant relationship depends on whether there is a right to control."). In addition to control and supervision, relevant secondary factors may include "the method of payment; the skill required in the occupation in question; the purported employer's provision of tools, instrumentalities, and a place of work; and the parties' understanding of the nature of the relationship created." *Nat'l Ass'n of Gov. Employees v. Labor Relations Comm'n*, 59 Mass. App. Ct. 471, 474 (2003) (citing, *inter alia*, *Khoury v. Edison Elec. Illuminating Co.*, 265 Mass. 236, 238 (1928)). Furthermore, according to the Larson treatise, an employer claiming tort immunity bears the burden of proving as an affirmative defense that the plaintiff was in fact an "employee" entitled to workers' compensation under the Act. *See* Larson, § 100.01.[17]

_____

[17] The parties have cited, and I have found, no Massachusetts case that identifies which party bears the burden of proof where

An employee who is precluded from pursuing a common law
claim against her employer nonetheless retains the right to
pursue a claim against "any person other than the insured person
employing such employee and liable for payment of the
compensation [under the Act]."  Mass. Gen. Laws ch. 152, § 15.
Roberts contends that her action against Delta falls into this
category of third party negligence actions.  Delta, on the other
hand, contends that Roberts's claim is precluded for two reasons:
(1) Roberts is judicially estopped from claiming she was not a
Delta employee at the time of her injuries based on her
settlement with Delta of her workers' compensation claim; (2)
Roberts was a Delta employee for purposes of the Act even when
she was working as a flight attendant for Song.  I will address
each of these issues in turn.

   *B.   Plaintiff's Settlement Agreement*

   Delta contends that even if Roberts was not a Delta
"employee" within the meaning of the Act at the time of her
injuries, she is estopped from pursuing this tort action because

_____

an employer claims tort immunity under the Workers' Compensation
Act.  Other jurisdictions that have addressed this issue under
their own workers' compensation statutes, however, have employed
the Larson treatise's approach and placed the burden on the
employer to prove the plaintiff's employee status when tort
immunity is sought.  *See, e.g., Smith v. Roman Catholic Diocese*,
677 N.Y.S.2d 183, 184 (N.Y. App. Div. 3d Dep't 1998) (Spain, J.).
This is reversed when determining whether an employee who pursues
a workers' compensation claim is an employee; there the employee
bears the burden of proving her employee status.  *See Haslam's
Case*, 451 Mass. 101, 108 (2008).

she received workers' compensation benefits from Delta under a Lump Sum Agreement in May 2008. I find, however, that this agreement only released Delta from the workers' compensation liability it had inherited from its merger with Song, LLC, and did not have any effect on Delta's separate potential liability in a third party negligence action.

Under § 48 of the Act, "the insurer and the employee may, with the written consent of the employer . . . redeem any liability for compensation, in whole or in part, by the payment by the insurer of a lump sum amount." Mass. Gen. Laws ch. 152, § 48. Although the settlement document in this case lists Roberts's employer as "Song Airlines/Delta (*In Dispute*)" (Doc. 18, Ex. 22) (emphasis added), the agreement was endorsed by a Delta workers' compensation specialist on behalf of Delta, and Delta has paid Roberts the benefits she was owed pursuant to the agreement. Section 23 of the Act, which dictates that an employee's acceptance of such compensation constitutes a release of all common law claims, ostensibly applies only to the claimant's employer and the employer's insurance carrier. There are, however, several lower court Massachusetts cases that have held where workers' compensation benefits are paid by the carrier of an entity that was not, or was not indisputably, the claimant's direct employer, that entity is nonetheless entitled to immunity from common law negligence claims under the Act.

*See, e.g., Callender v. CSH Realty Corp.*, 23 Mass. L. Rptr. 98, 2007 Mass. Super. LEXIS 360, *5 (Aug. 31, 2007).

In *Kniskern v. Melkonian*, the plaintiff had negotiated a lump sum settlement of a workers' compensation claim under § 48, but had attempted to reserve his right to later pursue a tort claim against the same party. 68 Mass. App. Ct. 461, 461–62 (2007). On the settlement form, the parties explained:

> The claimant alleged he was employed by [the defendant] when he fell and injured his right shoulder off premises. The employer denies the claimant was an employee, and insists instead that he was an independent contractor. . . . The employee is pursuing a tort claim at present, and . . . [t]his agreement shall not bar any party from advancing any claim or defense against one another as a result of the injuries sustained by the claimant . . . .

*Id.* at 463 (internal quotation omitted). The plaintiff claimed that the issue of employment was left unresolved by the settlement, and that § 23 should not bar his action in tort. The court disagreed, explaining that "employee status is a condition to recovery of the lump sum settlement under the Act; if [plaintiff] is an independent contractor, and not an employee, he is outside of the scope of the Act and could not have received a lump sum settlement pursuant to § 48." *Id.* at 465. Having accepted the benefits of the lump sum settlement, the plaintiff was therefore estopped from contending, for purposes of the tort action, that he was not an employee under the Act.

*Callender v. CSH Realty* reached the same result on a slightly different fact pattern. There, the plaintiff had filed for, and received, workers' compensation benefits from the defendant, despite evidence that another entity – an affiliate of the defendant - was his employer. 2007 Mass. Super. LEXIS 360 at *2-4. Citing *Kniskern*, the court held that although the defendant may not have been the plaintiff's actual employer, "the insured whose carrier pays the benefits is entitled to the statutory release of claims." *Id.* at *5.[18]

I find the present case distinguishable from both *Kniskern* and *Callender*. Unlike the plaintiffs in those cases, Roberts did not file a workers' compensation claim with the entity that she later sought to sue in tort, but rather filed it with her direct

_____

[18] Two other lower court Massachusetts cases reached conflicting results on a related issue in the context of subcontractors. Under § 18 of the Act, a contractor is required to provide workers' compensation coverage to an employee of an uninsured subcontractor, where the employee is injured performing subcontracted work. Mass. Gen. Laws ch. 152, § 18. In *Russell v. Donnell*, 60 Mass. App. Ct. 1126, 2004 WL 770991, *1 (April 12, 2004), the court held that where an employee accepts benefits from the general contractor for such a claim, it constitutes a release under § 23 of any common law claims against the general contractor. In *Larson v. Fred Salvucci Corp.*, 18 Mass. L. Rptr. 247, 2004 WL 2070894, *3 (Mass. Super. Sept. 14, 2004), the court reached the opposite conclusion, holding that common law claims were not released where the benefits were paid by an entity that did not employ the employee bringing the suit. Because the present case does not involve subcontractors or § 18, which provides an exception to the general rule that an employee may only file a workers' compensation claim with his or her employer, I find these cases inapplicable.

employer – Song, LLC – in 2005.[19]  In April 2007, Delta merged

its subsidiary Song, LLC into the parent corporation, leaving

Delta Air Lines, Inc. as the sole surviving entity.  When Roberts

consented, in 2008, to the Lump Sum Agreement that was endorsed

by Delta and paid out under Delta's workers' compensation policy,

Song, LLC no longer existed.

Under general Massachusetts corporate law, following a

merger, the surviving corporation remains "liable for[] all

liabilities and obligations of each of the constituent

corporations in the same manner and to the same extent as if such

. . . surviving corporation had itself incurred such liabilities

or obligations."  Mass. Gen. Laws ch. 156B, § 80.  *See also Braga*

*v. Genlyte Group, Inc.*, 420 F.3d 35, 43 (1st Cir. 2005) ("[T]he

consolidation of two or more corporations is like the uniting of

two or more rivers, neither stream is annihilated, but all

continue in existence.") (quoting *Atlantic & B. Ry. Co. v.*

*Johnson*, 127 Ga. 392 (1907)).  When a claim is made against a

surviving corporation, therefore, the key question is whether and

to what extent the constituent entities would have been liable

but for the mergers.  *See Braga*, 420 F.3d at 36.

If, as Roberts contends, she was not a Delta employee at the

---

[19] As discussed in Note 11, *supra,* although there is no
evidence in the record regarding the filing of this claim, I will
accept Roberts's account as undisputed for purposes of this
motion.

time of her injuries, she would potentially have had both a
workers' compensation claim against Song, LLC (her employer) and
a third party negligence claim against Delta (a third party).
The merger of Song, LLC and Delta would not have extinguished
either of those liabilities. *See Barrett v. Rodgers*, 408 Mass.
614, 618 (1990) ("[L]iability, whether actual or potential,
arising out of conduct antedating a corporate merger will not
evaporate merely because the liable corporation merges with the
employer of the injured party.") (citing *Gurry v. Cumberland
Farms, Inc.*, 406 Mass. 615 (1990)).  This presents the anamolous
circumstance in which a single legal entity, Delta, could
potentially be liable under both the workers' compensation scheme
and in a negligence lawsuit for the consequences of a single
workplace injury.  The Massachusetts Supreme Judicial Court has
described such an outcome as "very rare," noting that "[i]n the
absence of a statutory 'override' akin to the corporate merger
statute . . . such a result may be impossible."  *Id.*[20]  If

---

[20] The Supreme Judicial Court's observation in *Barrett* that
such a circumstance is "very rare" may have been an
understatement.  I am unaware of any case in Massachusetts where
a single entity has been found liable for injuries arising from a
single workplace incident under both workers' compensation and
common law negligence.  In *Gurry v. Cumberland Farms, Inc.*, 406
Mass. 615 (1990), the court held that a corporate employer that
would otherwise have been immune from actions by the employee
plaintiff under the Workers' Compensation Act could be held
liable in tort for the inherited negligence of its corporate
predecessor.  There, however, the plaintiff had not earlier
sought or received workers' compensation benefits from the
constituent corporations or from the surviving employer
corporation.

Roberts were not deemed to be a Delta employee at the time of her injuries, however, this case would present precisely such an "override" of the usual policy against double recoveries.

In light of these circumstances, I find that where Roberts's Lump Sum Agreement purported to "redeem liability" for her workers' compensation claim, it merely redeemed the liability that Delta inherited from Song, LLC as a result of their merger. Unlike the plaintiffs in *Kniskern* and *Callender*, therefore, Roberts did not implicitly acknowledge that Delta had been her employer within the meaning of the Act when she accepted the settlement benefits. Roberts is consequently not estopped from contending in this proceeding that she was not an "employee" of Delta at the time of her injuries.

    *C.   Plaintiff's Employment Status with Delta*

There are two ways in which Roberts could have maintained her status as a Delta employee even after accepting her position as a Song flight attendant. First, Delta and Song could be considered a single employer for purposes of the Workers' Compensation Act. Second, Roberts could have been a "loaned servant" who maintained an employer-employee relationship with both entities.

    <u>1.   Delta and Song as a Single Employer</u>

Delta contends that because Delta and Song, LLC were not "operationally distinguishable," Roberts remained "directly

employed by Delta" even after she became a Song flight attendant. This contention is that Delta and Song, LLC effectively constituted a single employer for purposes of the Workers' Compensation Act. Some jurisdictions, such as New York, have applied workers' compensation exclusivity provisions in similar circumstances, finding that a particular wholly-owned subsidiary was nothing more than the "alter ego" of the parent corporation. *Ortega v. Noxxen Realty Corp.*, 809 N.Y.S.2d 546, 547 (2006); *see also Gaines v. Excel Indus., Inc.*, 667 F. Supp. 569, 576 (M.D. Tenn. 1987) (recognizing that where a parent corporation exercises "complete dominion" over a subsidiary, Tennessee courts sometimes treat the subsidiary as a mere "instrumentality" with "no separate mind, will or existence of its own") (internal quotations omitted).

Massachusetts, however, has strictly respected the distinct identities of separate corporate entities. *See My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619-20 (1968) (citing Peairs, Business Corporations §§ 8-10). The Supreme Judicial Court has held that "[t]he rule in the Commonwealth is that corporations are to be regarded as separate entities where there is no compelling reason of equity 'to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries.'" *Berger*, 416 Mass. at 657 (quoting *Gurry*, 406 Mass. at 626). *Cf. In re Indus. Commercial*

*Elec., Inc.*, 319 B.R. 35, 49 (D. Mass. 2004) (holding that under Massachusetts corporate law, "[e]ven when joint owners of related corporations fail to treat and operate those corporations as separate entities . . . the law treats [inter-corporate] transactions as if they were between two separate entities, unless someone injured by the corporations' conduct can supply a sufficient reason to do otherwise.")

A corporation operating in Massachusetts may not claim common identity with one of its affiliates as a means of benefitting from workers' compensation immunity. *See Searcy v. Paul*, 20 Mass. App. Ct. 134, 139 (1985) (holding that injured employees may bring negligence actions against corporate affiliates of their employer). The Supreme Judicial Court has made it clear that "[c]orporations may not 'assume the benefits of the corporate form and then disavow that form when it is to their and their stockholders' advantage.'" *Berger*, 416 Mass. at 658 (quoting *Gurry*, 406 Mass. at 626). As the Sixth Circuit explained in a similar workers' compensation case:

> [A] business enterprise has a range of choice
> in controlling its own corporate structure.
> But reciprocal obligations arise as a result
> of the choice it makes. The owners may take
> advantage of the benefits of dividing the
> business into separate corporate parts, but
> principles of reciprocity require that courts
> also recognize the separate identities of the
> enterprises when sued by an injured employee.

*Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 662 (6th Cir.

1979). This approach has been adopted in other jurisdictions as well. For example, in *Peterson v. Trailways, Inc.*, 555 F. Supp. 827, 828 (D. Colo. 1983), a federal district court held that under Colorado workers' compensation law, a parent corporation and its subsidiary should be treated as separate entities even where: the subsidiary's officers were all employees of the parent corporation; the parent and subsidiary had common supervision as to employment policies and procedures; and the subsidiary was insured through the same workers' compensation policy as the parent.

Although Delta contends that Song "was run as if it were any other Delta 'department' within Delta's business," (Doc. 20 at 6) there is no dispute that Song, LLC was formed by Delta as a separate subsidiary company. Song remained a separate company – and not merely a "division" – even when Delta changed its name for a time to "Delta d/b/a Song, LLC." Neither the fact that Delta, pursuant to FAA regulations, retained operational control over the actual flights conducted under the trade name "Song," nor the fact that Song officers remained Delta employees who ultimately reported to the President of Delta, alters the fact that Song, LLC remained at all times a separate legal entity. I will therefore respect the corporate formalities and treat Delta and Song, LLC as separate and distinct employers for purposes of the Act.

## 2. Roberts as a "Loaned Servant"

Under the "loaned servant" doctrine,[21] which has long been recognized in Massachusetts law, "one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become, as to that service, the servant of such third party." *Ramsey's Case*, 5 Mass. App. Ct. 199, 202 (1977) (internal quotations omitted). In such a scenario, the lending employer is known as the "general employer" and the borrowing employer as the "special employer." *See* Larson, § 67.01. This type of arrangement is recognized in the Massachusetts Worker's Compensation Act, under which "[t]he word 'employer' shall include both the general employer and the special employer in any case where both relationships exist with respect to an employee." Mass. Gen. Laws ch. 152, § 1(5).

In determining an employee's status in a loaned servant scenario, "[t]he basic question is generally no different from the normal one in determining whether an employee is the servant of a particular principal." *Kelley v. Rossi*, 395 Mass. 659, 663 n.5 (1985); *see also* Larson, § 67.01 ("In one sense, the lent-employee doctrine is not a separate doctrine at all."). In Massachusetts, an employer-employee relationship is identified primarily by the right to control: by whom an employee is

---

[21] This doctrine may alternatively be referred to as the "borrowed servant" or "borrowed employee" doctrine.

directed and to whom she owes obedience in the performance of her job duties. *See Patterson*, 48 Mass. App. Ct. at 591 n.13. In general, it is a question of fact whether a general or a special employer, or both, have the right to control an employee's conduct. *See* Restatement (Third) of Agency § 7.03 cmt. d(2) (2006). In Massachusetts, when an individual has an employer-employee relationship with both types of entities, liability for the payment of workers' compensation is borne in the first instance by the general employer and secondarily by the special employer. Mass. Gen. Laws ch. 152, § 18. Both the general employer and special employer are therefore entitled to the quid pro quo tort immunity provided by the exclusivity provisions of the Workers' Compensation Act. *See* Larson, § 67.01.

Although Delta contends that Roberts remained at all times a general employee of Delta, I find that Roberts has produced ample evidence that she ended her general employment with Delta by becoming an employee of Song, LLC. Prior to becoming a Song flight attendant, Roberts was required to complete an application that purported to define her "employment relationship with Song Airways, LLC" and referred to the role of "Song supervisory or management personnel" in modifying the terms of her employment. Furthermore, as a Song employee Roberts received her paychecks directly from the entity Song, LLC. She was also issued a Song employee ID number and wore both a Song uniform and a Song ID

badge.  Although Roberts has provided no direct evidence of her
duty of obedience to Song supervisors, I find that such a duty
can justifiably be inferred on this record from the existence of
Song corporate officers and supervisors and Roberts's position as
a flight attendant for the company.  To the extent that Delta
contends Roberts was somehow not an employee of the Song, LLC
subsidiary,[22] therefore, I find that Roberts has provided
sufficient evidence at least to raise a genuine issue of fact.  I
will assume, therefore, that Song could be considered Roberts's
general employer.

The question remains, however, whether Delta may be deemed
to have been Roberts's special employer at the time of the runway
incident.  The key issue, as for any test of employee status, is
whether Delta exercised the right to control and direct Roberts's
job performance.  Delta has provided evidence, in the form of
sworn witness statements, that not only did Delta determine the
broad employment policies for Song personnel, but Delta
supervisors also directly assigned Song flight attendants to
particular flights and then supervised and evaluated their job

---

[22] Delta contends that Roberts "was at a bare minimum a
'loaned servant,' subject entirely to Delta's control."  If
Roberts had remained *entirely* subject to Delta's control, of
course, she would not have been a "loaned servant" at all, but
rather an employee only of Delta and not of Song, LLC.

performance.[23]  This is consistent with FAA regulations

indicating that flight attendants are to be assigned to flights

by the holder of an Operating Certificate, which in this case was

Delta Air Lines, Inc., and not Song, LLC.  *See* 14 C.F.R. §

121.467 (defining a "flight attendant" as "an individual, other

than a flight crewmember, who is assigned by a certificate holder

. . . to duty in an aircraft during flight time . . . .")

Roberts herself acknowledged in her deposition testimony that

following the runway incident, she used the direct line to Delta

Operations in Boston to ask whether she could leave the flight

and to receive further instructions.[24]  Federal regulatory

provisions also invested Delta with in-flight authority over Song

flight attendants through the Delta pilots who operated the

aircrafts.  *See* 14 C.F.R. § 121.533 (requiring that aboard any

flight, "[e]ach pilot in command has full control and authority

in the operation of the aircraft, without limitation, over other

crewmembers and their duties during flight time").  To the extent

that this authority extends to flight attendants, Roberts was

subject during any flight to the authority of the Delta pilot in

command.

---

[23] For example, Delta personnel assigned Roberts to serve as
a flight attendant for the particular flight on which she
suffered her injuries.

[24] Roberts was informed by the Delta operator that she should
stay on the flight until Las Vegas, where she would be taken if
she was still feeling injured.

Roberts contends that there is a genuine factual dispute as to who was responsible for controlling her job performance, and asserts in her summary judgment brief that as a Song flight attendant she "no longer reported to Delta personnel."  This assertion, however, is not supported by any evidence in the record.[25]  As the Supreme Court has indicated, the party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  In this case, in light of the uncontradicted evidence that, pursuant to federal regulations, Delta exercised control and direction over Roberts's job performance at the time of her injuries, I find that Roberts was a "loaned servant" from Song to Delta, and that she is therefore precluded under the Workers' Compensation Act from bringing this action in tort against Delta as her special employer.

## CONCLUSION

For the reasons set forth more fully above, I GRANT the defendant's motion for summary judgment.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[25] There was also no evidence to this effect in the exhibits of Roberts that I held inadmissible, *see* Section III, *supra*, including the plaintiff's own deposition testimony.